# **AFFIDAVIT**

I, Michelle C. Delpha, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information.

2. I am employed as a Special Agent with the Federal Bureau of Investigation (FBI) in the Rutland, Vermont resident office. I have been so employed for nineteen years. During that time, I have participated in multiple investigations involving a wide array of criminal offenses, including violent crimes. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of and to make arrests for offenses involving violent crimes and sex trafficking. I am also empowered to participate in investigations involving the distribution of controlled substances. With respect to the instant investigation, I have been working with the Northern Vermont Drug Task Force.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

3. The property to be searched is: (1) an iPhone, white in color, model # is unknown and there is no s/n listed on the outside of the iPhone, (2) a black Samsung Galaxy, model # SM-G900A, s/n is not legible, IMEI: 354691061093157 , (3) a black AT&T cellphone with external keypad, model# Z432, s/n 9B0422411DB4, and (4) a black AT&T cell phone with a broken touchscreen, model# Z992, s/n 327B4161D464. The devices are currently in the custody of the Vermont State Police (VSP) and were secured at the VSP's Williston barracks until they were

turned over to the custody of the Burlington Police Department, where they are currently being held. The devices are described in Attachment A and photographs of the devices are attached to Attachment A.

4. The applied-for warrant would authorize the forensic examination of the devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

5. Based on the information described below, I believe there is probable cause to believe that the devices contain evidence of offenses involving the distribution of controlled substances and the conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841 and 846. The purpose of this application is to seize and search evidence, more particularly described in Attachment B, incorporated herein by reference, as evidence, fruits, and instrumentalities of criminal activity.

6. This case has been investigated by me, along with detectives of the Northern Vermont Drug Task Force (VTDTF). I make this affidavit based upon the information provided to me by Detectives of the VTDTF, both verbally and by way of written reports, as well as my participation in the investigation. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included details of every aspect of the investigation. Indeed, there are other aspects of the ongoing investigation that have not been reported here.

7. In March 2014, I was assigned to investigate a possible violation of human trafficking involving a female juvenile from Vermont. During the investigation, I learned that a black male who went by the nicknames of "Flee" and "Jon-Jon" had taken the female to New York for purposes of prostituting her for profit. I also learned that "Flee/Jon-Jon" was known to sell heroin, cocaine and crack in the Burlington, Vermont area, including other Vermont towns in

Chittenden County. Thereafter, I obtained search warrants to obtain location information data on "Flee/Jon-Jon's" then-known cell phone and a forensic examination of the female juvenile's phone. In the prior search warrant affidavit that I prepared, there is information about "Jon-Jon's" drug activities, as reported by the female juvenile victim. There is also information about "Jon-Jon/Flee" being in possession of a gun.

8. On October 31, 2014, I, along with VSP Trooper Matt Daley, spoke with a Vermont State Police cooperating individual (CI) who I had been told knew "Jon-Jon." This CI has participated in controlled buys in this case and others. The CI's criminal history includes four felony convictions (marijuana possession, marijuana sale, escape, aggravated assault) and ten misdemeanor convictions (unlawful sheltering, domestic assault, simple assault, two careless or negligent operation of vehicle, attempt to elude law enforcement officer in a vehicle, marijuana possession, leaving the scene of an accident, hindering arrest). According to the CI, the CI was hanging around "Jon-Jon" in early 2014 and was around "Jon-Jon" a lot. Jon-Jon sold heroin, cocaine and crack cocaine, and CI bought heroin from "Jon-Jon" in early 2014. Jon-Jon always carried a 9mm gun on him. The CI did not know Jon-Jon's true identity but told me that he/she follows Jon-Jon's Instagram account. Using his/her cell phone, the CI accessed the account and showed me a photo of Jon-Jon. Using his cell phone, Trooper Daley took a photo of "Jon Jon" from the Instagram account accessed by the CI. According to the CI, Jon-Jon recently got out of jail relating to charges of simple assault from late 2013 time frame and charges relating to an attempt to steal a police cruiser from several months ago. The CI also told me that Jon-Jon's girlfriend's name was "Laney" and that Jon-Jon had recently contacted the CI using phone number 802-373-3528.

9. On October 31, 2014, Trooper Daley located a police report for an incident which involved an attempted theft of a VSP cruiser, as well as other offenses. Trooper Daley also obtained an arrest photo of the individual who was arrested for the attempted theft of the police cruiser. Trooper Daley provided me a copy of the arrest photo. I reviewed the arrest photo and noted that the individual depicted in it appeared to be the same individual I had seen in the photo of "Jon-Jon" on the Instagram account in the CI's phone earlier that day. Trooper Daley provided me the identity of the individual depicted in the arrest photo: Ian Jasmin, a 30 year-old black male.

10. On November 3, 2014, I met with the juvenile female victim of the human trafficking investigation and showed her a photo array which included a photo of Ian Jasmin. The juvenile victim female identified Ian Jasmin as the person she knew as "Flee" and told me she was certain it was him.

11. I reviewed police reports and other documents relating to Ian Jasmin's arrests in Vermont and learned Jasmin had been in Vermont jails, for those offenses, from about May 1, 2014 until September 15, 2014. I then requested and obtained Ian Jasmin's recorded jail calls from the Vermont Department of Corrections for this time period.

12. Upon receiving copies of the recorded jail calls and other documentation related to the calls, I learned that there were over a 1,100 calls made by Jasmin from jail during this time period and that it cost Jasmin over $1,700 to make these calls. To date, I have listened to over 350 of the calls from the time frame of June 4, 2014 through June 18, 2014, a two-week period. Based upon what I have heard during the phone calls I have listened to so far, I believe that Jasmin, while in the custody of the Vermont Department of Corrections, was conspiring with at least one other individual, Delilah Necrason, to bring controlled substances from New York City,

to the Burlington, Vermont area, for the purpose of selling them. I learned the following information during my review of the phone calls so far:

    a.    Necrason identified herself as Delilah Necrason during the phone calls between herself and Jasmin. Necrason also provided her DOB and her parents' address to Jasmin during the calls. Necrason and Jasmin also refer to Necrason as "Laney" during these calls.

    b.    During the two-week period of the calls I have listened to, Necrason traveled to New York City on three different occasions for the purpose of picking up controlled substances from Jasmin's source of the controlled substances. The three trips occurred on or about June 5, 2014, June 9, 2014 and June 17, 2014. Each of these trips were made by Necrason at the instruction and direction of Jasmin.

    c.    Jasmin's source of the controlled substances in New York City is a male who Jasmin refers to as "B-Way" or "Broadway" during the phone calls.

    d.    Prior to Necrason's trips to the city, or while she is en route, Jasmin will ask Necrason "how much" she has. After getting a figure from Necrason, Jasmin will instruct Necrason how much of the controlled substances to purchase from "B-Way." Jasmin refers to the amounts of controlled substances as "blocks" of either "uptown" or "downtown." I have spoken with other FBI agents and detectives of the VTDTF who conduct drug investigations and learned that these are terms that are known to be used by individuals who distribute controlled substances for the purpose of concealing the amount and particular controlled substance they are requesting. For example, on 06/05/2014, during a phone call between Jasmin and Necrason (which was placed at approximately 07:39 AM), Necrason placed a 3-way call to "B-Way" during which Jasmin spoke with

5

"B-Way." During this phone call, Jasmin told "B-Way" that Necrason was "in Manhattan, on Amsterdam, between 62nd and 63rd." Jasmin further tells "B-Way" that Necrason has "670" not "800" and then tells "B-Way" "10 blocks up from Manhattan" and "5 blocks down from the Bronx."

    e.    It appears from the phone calls that Necrason would also contact "B-Way" directly to arrange the transactions after Jasmin would instruct her what to purchase from him.

    f.    After Necrason returned to Vermont from these three trips, I heard discussions between Jasmin and Necrason regarding how much money Necrason had made as of the time of the phone call and how much product remained. For example, during a phone call on 06/06/2014 (which was placed at approximately 7:17 PM), Jasmin asks Necrason how many "rabbits" she has left. I have been told from FBI agents and detectives who conduct drug investigations that "rabbits" is a term used by individuals who distribute controlled substances to conceal that they are speaking about an amount and/or particular type of a controlled substance. During the call, Jasmin instructs Necrason to pull her vehicle over to the side of the road and count. Necrason counts and tells Jasmin "11 ½ and 500." It is believed that "500" referred to the amount of money Necrason had on her.

    g.    In a phone call between Jasmin and Necrason on June 6, 2014 (placed at approximately 7:43 PM), which was a day after she returned to Vermont after her trip to New York City, Necrason told Jasmin, "I'm seeing Dave again." Jasmin replied, "You're not supposed to be seeing people yourself. You're supposed to sit in one spot." Jasmin then tells Necrason that if the police get her car "…they will get everything."

13. I reviewed a report written by Detective Matthew Plunkett, of the VTDTF, and learned that on December 18, 2014, the above-referenced CI told Detective Plunkett that Jasmin currently had powdered cocaine for sale and that he would sell four packages for $100.00. On the same date, the CI placed a recorded call to Jasmin to order the cocaine. The CI told Detective Plunkett that the phone number being used by Jasmin was 802-373-3528, the same number it had provided previously. The CI called Jasmin and spoke with him by phone using that number. During the call, Jasmin agreed to meet with the CI. Later that day, the VTDTF used the CI to make a controlled purchase from Jasmin. Prior to meeting with Jasmin, the CI was searched for contraband, large sums of money, or weapons, and none was found. The CI was provided with a recording device, which records audio and video. Detective Plunkett reviewed the recording afterwards and documented the controlled buy in his report. The CI was observed by law enforcement walking into the parking garage. According to the audio recording, the CI had contact with no one prior to speaking with Jasmin. Upon exiting the parking garage, the CI met law enforcement at a designated location and nearby and turned over small packages of a white powder, which was field tested and tested presumptively positive for the presence of cocaine. The cocaine weighed 1.2 grams with packaging. After the transaction, the CI told members of the VTDTF that it met with Jasmin in a vehicle driven by an unknown male. The CI provided the money to Jasmin and Jasmin provided the CI with the four small packages of cocaine.

14. I reviewed a report written by Detective Matthew Plunkett, of the VTDTF, and learned that on January 14, 2015, the CI told Detective Plunkett that Jasmin had just returned to Vermont and should have drugs for sale. Later that day, the CI placed a recorded call to Jasmin, to phone number 802-373-3528, to order the cocaine. During the call, the CI asked Jasmin what he had available. Jasmin asked the CI what it wanted. The CI asked for $100 worth of cocaine.

7

Jasmin agreed to meet with the CI later that day. That same day, the VTDTF made a controlled purchase of cocaine from Jasmin using the same procedures described above. The CI met with Jasmin and paid him $100. Jasmin gave the CI a small package of white powder and an additional small chunk of a white substance. This transaction was monitored and controlled by members of the VTDTF. Some of the suspected cocaine was field tested using a NIK field test kit and tested positive for cocaine. The cocaine weighed .76 grams with packaging. After the transaction, the CI told members of the VTDTF that it met with Jasmin in the backseat of a vehicle with two unknown white males in the front seats of the vehicle. The CI provided the money to Jasmin and Jasmin provided the CI with the cocaine.

15. I reviewed a report written by Senior Investigator John Vandermolne, of the New York State Police (NYSP), and learned that on January 17, 2015, Ian Jasmin was arrested in Clarkstown, New York, by the NYSP for charges relating to possession of a controlled substance, use of drug paraphernalia, impersonation and for an outstanding parole violation warrant. The impersonation charge pertained to Jasmin providing a false name and DOB to the NYSP at the time of his arrest. Jasmin's true identity was determined during the NYSP's arrest processing of Jasmin (fingerprint scanning). The scanning of Jasmin's fingerprints provided the NYSP with Jasmin's true identity and criminal history. The false identity Jasmin provided to NYSP was "Justin Cellis," DOB 3/16/1989. Jasmin is currently in custody at the Rockland County Correctional Facility in New York.

16. On February 12, 2015 and again on February 17, 2015, I spoke with Detective Jeff Beerworth, of the Burlington Police Department (BPD), who had advised me that on January 12, 2015, five days prior to Jasmin's arrest by the NYSP, it is believed Jasmin was with Delilah Necrason during a stop of Delilah Necrason's vehicle, further described as a silver-colored

Honda Civic, with Vermont license plate FLE908, by an officer of the BPD, for a traffic violation. The officer identified the driver of the vehicle as Delilah Necrason. The passenger of the vehicle was a black male who verbally provided the officer the name "Justin Cellis" and DOB 03/16/1989. This was the same alias name and DOB Jasmin used at the time of his arrest by the NYSP on January 17, 2015. The silver-colored Honda Civic is registered to Adam Necrason, Delilah's step-father. This is the same vehicle that Delilah Necrason is stopped in by law enforcement on February 15, 2015, at which time she is carrying twenty grams of a substance that tested positive for the presence of cocaine.

17. I have read reports written by Detective Plunkett and Detective Karl Gardner, both of the VTDTF, and learned the following. On February 15, 2015, Detectives Plunkett and Gardner received information that a Correctional Officer of the Rockland County Correctional Facility, in New York, who had been monitoring Jasmin's non-privileged phone calls, overheard a phone call between Jasmin and his girlfriend (who was known by members of the VTDTF to be Delilah Necrason), during which Necrason told Jasmin that she was in possession of controlled substances, was heading home and was about an hour North of Brattleboro, Vermont. The VTDTF knew Necrason to be from the Burlington, Vermont area. It was believed, based upon the phone call, that Necrason would have controlled substances in her possession. Based upon information the VTDTF had previously received from the Burlington Police Department regarding Necrason, it was believed that Necrason would be traveling in a silver Honda Civic bearing VT registration FLE908.

18. While monitoring northbound traffic from the Waterbury Rest Area, Detective Sergeant Karl Gardner, of the VTDTF, observed a silver vehicle that appeared to be a Honda Civic, at approximately 1855 hours, with Vermont registration FLE908. Detective Sergeant

Gardner observed that the vehicle was being driven by a female. Detective Gardner followed the vehicle North on I-89 in the direction of Burlington. As they approached exit 12 (Williston), Detective Gardner observed a traffic violation committed by the operator of the vehicle. The traffic violation information was relayed to an Officer of the South Burlington Police Department who subsequently stopped the vehicle on Route 2A, in the vicinity of the Chili's Restaurant. The officer identified the operator of the vehicle as Delilah Necrason. During the traffic stop, Necrason provided the officer consent to search the vehicle. Officers searched the vehicle and did not locate any contraband inside the vehicle. Detective Gardner and Detective Matthew Plunkett then spoke with Necrason. While speaking with the detectives, Necrason voluntarily provided Detective Plunkett with approximately twenty grams of white powder that she had hidden in her pants. The suspected cocaine was field tested using a NIK field test kit and tested positive for cocaine. Necrason also told the detectives that her boyfriend was Ian Jasmin and that she was returning from a trip during which she visited Jasmin at the Rockland County Correctional Facility, in New York, for Valentine's Day (the previous day).

19. After the cocaine was located, Necrason provided consent for the detectives to bring her vehicle to the VSP's Williston barracks so that they could conduct a more thorough search. During the search of the vehicle, Detective Gardner located and seized the above-identified four cell phones from inside the vehicle. It was noted by Detective Gardner that all of the cell phones were on at the time they were located, actively making sounds consistent with incoming calls or messages. Detective Gardner also located a roll of money which contained 100's, 50's and 20 dollar bills. Detective Gardner found this to be odd due to the fact that Necrason claimed to have no money during his earlier interaction with her. Detective Garnder recorded the serial numbers and took photos of the money, and then returned the money back

into the purse which was inside the vehicle. Detective Gardner also photographed a US mail receipt of a package that Necrason had sent to Ian Jasmin at the Rockland County Correctional Facility, in New York.

20. Based on my knowledge, training, and experience, as well as my discussions with other law enforcement officers who conduct drug investigations, I know that narcotics traffickers commonly use cell phones to communicate by voice, email and text message with customers, co-conspirators, and suppliers; and to store information (including images) related to their narcotics trafficking, including contact information for customers, co-conspirators, and suppliers; financial account numbers and other information related to the proceeds of trafficking; information related to trafficking-related travel; images of narcotics, firearms, co-conspirators, and assets; and other information related to their trafficking.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending,

receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been.

Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.    IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of

13

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same states.

23. Based on my training, experience, and research, I understand that one or more of the devices seized have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

25. Forensic evidence: As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26. Nature of examination: Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

27. Manner of execution: Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

28. Based on the above information, there is probable cause to believe that 21 U.S.C. §§ 841 and 846 have been violated, and that property, evidence, fruits and instrumentalities of these offenses (or attempt to commit these offenses) is located on the identified devices, more fully described in Attachment A. I request authority to search such devices as set forth in Attachment B.

Sworn to under the pains and penalties of perjury,

_Michelle C Delpha_
Michelle Delpha
Special Agent
Federal Bureau of Investigations

SUBSCRIBED and SWORN before me on February 17, 2015.

_signature_
HONORABLE JOHN M. CONROY
UNITED STATES MAGISTRATE JUDGE